IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| RONNIE DOOLEY, *et al.*, individually and on behalf of all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>RONALD SAXTON, RODERICK C. WENDT, R. NEIL STUART, and JELD-WEN EMPLOYEE STOCK OWNERSHIP & RETIREMENT PLAN,<br><br>Defendants. | Case No. 1:12-CV-1207-MC<br><br>Consolidated with Case Nos: 1:13-CV-177-MC & 1:13-CV-395-MC<br><br>**DECLARATION OF MATTHEW HURST** |

<u>DECLARATION OF MATTHEW HURST</u>

Pursuant to 28 U.S.C. § 1746, the undersigned attests to the following under the penalties of perjury:

1. My name is Matthew Hurst and I am a named partner in the firm of Heffner Hurst (formerly Susman Heffner & Hurst).

2. Heffner Hurst has be lead or co-lead counsel in numerous ERISA class actions. We tried one of the largest ERISA cases in history, *Young v. Verizon's Bell Atlantic Cash Balance Plan*, No. 05-7314 (N.D. Ill.), *affirmed Young v. Verizon*, 615 F.3d 808, 815 (7th Cir. 2010), which involved a multi-billion dollar error in calculating plan participants' opening balances when it converted from a traditional pension plan to a cash balance plan. My firm succeeded in a trial on the papers, convincing the court of their interpretation of a defined

1

Exhibit 1

benefit calculation. Additionally, I was lead counsel in *Schumacher v. AK Steel*, No. 09-794 (S.D. Ohio), *affirmed in part and reversed in part*, 711 F.3d 675 (6th Cir. 2013). I successfully obtained summary judgment despite novel issues of whether a release obtained from class members, purporting to release "all claims," can validly waive the right to ERISA benefits. I successfully defended this case on appeal to the Sixth Circuit and won a rare reversal of a low prejudgment interest rate award at the trial level. *Id.* Prior to joining the firm, I was counsel in litigation against Arthur Anderson, during liquidation, to preserve retirement benefits of retired partners. Despite the threat of impending bankruptcy and absence of ERISA protections due to the top hat status of the plan, the litigation allowed clients to recover a portion of their benefits. Most recently, my firm successfully settled *Calvin et al v. San Antonio Spurs, L.L.C. et al.*, No. 14-667 (W.D. Tex.), for $1.5 million against the American Basketball Association for failure to provide requisite notices under ERISA. In addition, my firm has been lead counsel in numerous non-ERISA class and derivative actions.

3. Along with Cohen Milstein, my firm has been appointed Co-Lead Counsel by this Court in the above-captioned action.

4. I have been one of the counsel of record since the filing of the initial suit of *Dooley v. Saxton, et al.*, No 12-1207 (D. Or.).

5. Mr. Dooley first approached my firm in March of 2012 with concerns about the effect of the JELD-WEN ESOP amendment on his benefits. Our pre-suit investigation included reviewing over-one-hundred-pages of Plan documents and amendments, hundreds of pages of Plan communications, benefit statements, and letters to Mr. Dooley and other participants. As part of this investigation, we researched the legal and factual underpinnings of both the Plan and the amendments, including review of numerous legal precedents, DOL and IRS regulations, and their relevant legislative or rule-making history. We also searched for and reviewed other, similar ESOP configurations, reviewing thousands of pages of plan

documents, to help better understand the issues in this litigations. We also issued FOIA requests to the Department of Labor for all JELD-WEN Plan documents.

6. Mr. Dooley retained my firm to prosecute this case. Subsequently, Mr. Kitt was added as an additional plaintiff to provide standing for individuals who were still awaiting complete distribution of their benefits as Mr. Dooley had been completely paid out by the commencement of the litigation.

7. After filing the suit, and Defendants' answer, we drafted and issued discovery to the Defendants. We felt Defendants' production was incomplete and attempted to resolve the disputes with opposing counsel. When that did not resolve the issues, we drafted and filed a motion to compel.

8. Defendants moved to stay this case and remand it to the administrative review process on October 1, 2012. They argued that to determine if there was a cutback of benefits, the administrative review committee needed to interpret the Plan to determine what Mr. Dooley was entitled to under the Plan before the Court could decide if those benefits were cutback by the amendment. Since the administrative review committee was comprised of the individual defendants in this case, I had no illusion that they would interpret the Plan in a manner that found there was no cutback.

9. Coupled with Defendants' motion to remand, we filed a motion to compel answers to discovery. In response to Plaintiffs' discovery requests, Defendants responded (1) objecting because of a then yet unfiled motion to stay; (2) objecting based on alleged privilege issues; and (3) objecting because of alleged confidentiality issues. This motion was fully briefed by the parties.

10. After fully briefing both motions, I traveled to Oregon for an hour long oral argument before Judge Papak. Judge Papak made findings and recommendations denying Defendant's motion and granting Plaintiffs' motion.

11. Defendants appealed Judge Papak's findings and recommendations to Judge Hernandez. After further briefing, Judge Hernandez denied Defendants' appeal.

12. Cohen Milstein, who had entered this litigation by filing an action in Medford after exhausting the administrative process, and my firm agreed to jointly share responsibility for this litigation. One of the advantages to joint representation, among many others, was that we could now argue that administrative review was unnecessary but, if was determined by an appellate court to be required, we could also show the process had been exhausted.

13. Cohen Milstein and my firm agreed from the outset to careful delineation of work between the firms, restricting personnel billing on this matter to a select few, in order to efficiently handle the litigation. I believe we have successfully avoided duplication of efforts while simultaneously drawing on each other's unique skill sets.

14. Thereafter, the parties agreed to mediate this case before retired Magistrate Judge Morton Denlow. Judge Denlow is well-versed in class actions, as a former practitioner himself before joining the bench, and has extensive knowledge of ERISA.

15. As a condition of mediation, Co-Lead Counsel requested, and Defendants provided, certain documents and the data on each individual participant's account. Defendants produced documents totaling approximately 1,200 printed pages of discovery and another 9,700 pages worth of detailed spreadsheets.

16. The parties prepared and exchanged detailed merits briefs, comprising 50 pages, in advance of the mediation. These briefs were akin to summary judgment briefs and, as such, we spent significant time and effort researching both our arguments and Defendants' arguments.

17. The initial mediation occurred in Chicago on August 27, 2013, and lasted approximately 11 hours. Certain key provisions of the settlement were determined at that

Exhibit 1

meeting, including $14 million in cash recovery for the Class, a prohibition on new expenses, and verification of the data.

18.     The parties did not resolve the scope of the release. Defendants wanted an extremely broad release of claims that Plaintiffs' Counsel believed went beyond the scope of the litigation. Despite dozens of emails and telephonic conferences, the parties were not able to resolve their differences.

19.     The parties mediated all day in Chicago again on January 10, 2014, regarding the scope of the release and other issues. The parties made progress, but there was no final agreement.

20.     On January 27, 2014, the parties met in Philadelphia. After lengthy negotiations the parties were able to reduce the settlement terms to an Agreement in Principle. The final Agreement in Principle included $14 million in cash recovery for the Class, a prohibition on new expenses, verification of the data, confirmatory discovery, and a significantly narrower scope of released claims than Defendants sought. The negotiations leading to this agreement were lengthy, hard-fought, and extremely difficult.

21.     After the parties had reached their Agreement in Principle, but before the completion of confirmatory discovery, Defendants retained Nicholas Saakvitne to serve as an independent fiduciary for the JELD-WEN ESOP to review the proposed settlement and make an independent determination as to whether it is in the best interests of the Plan. I received a copy of Mr. Saakvitne's final opinion dated June 19, 2015, a true and correct copy of which is filed as Exhibit 2 to the memorandum.

22.     Pursuant to the Agreement in Principle, Co-Lead Counsel requested that Defendants provide certain additional documents. There were significant disputes between the parties on the scope of the production. After significant discussions between the parties,

Defendants produced approximately 2,500 pages of printed discovery and another 17,000 pages of detailed spreadsheets.

23. After receiving those additional documents, Co-Lead Counsel produced a list of individuals who we wished to depose. As with the document production, there were significant disputes between the parties on the scope of the witnesses to be produced. Ultimately, the parties agreed on the scope of oral discovery and conducted an interview of a representative member of the Committee and a Rule 30(b)(6) deposition of the Plan in August 2014.

24. During the course of those depositions and follow-up discovery in August 2014, Co-Lead Counsel learned that there were approximately 740 participant accounts which had not been included in the data previously provided by Defendants. Specifically, the 740 accounts were for those participants who had terminated between January and November 2010.

25. The original settlement of $14 million was based on data produced by Defendants prior to the mediation. Based on this data, Co-Lead Counsel had calculated the maximum damages as approximately $29.3 million.

26. The amount of losses was a matter of significant dispute through the settlement negotiations.

27. Co-Lead Counsel requested that Defendants provide the data for the 740 participant accounts and then calculated the losses for those participants. Based on that data, and subsequent declines in the stock price, Co-Lead Counsel recalculated the maximum damages as $34.555 million. In light of the new data, Co-Lead Counsel made a demand that Defendants increase the amount to be paid pursuant to the Settlement.

28. The negotiations over this issue were protracted. After a series of significant additional exchanged offers and negotiations, these negotiations lead to Defendants agreeing

to contribute an additional $1.5 million as part of the settlement. As a result, the parties ultimately agreed that Defendants would pay $15.5 million pursuant to the settlement plus provide certain other non-monetary consideration.

29. The $15.5 million cash portion of the settlement amounts to approximately 45% of the maximum losses of all Class Members.

30. After the confirmatory discovery was completed, and after an agreement had been reached on the 740 Class Members, the parties exchanged a number of drafts of a final settlement agreement. Many disputes arose during this process, including excluding individuals from the Class individuals who were responsible for the breach of fiduciary duty and the amendment, as well as protection that the recovery would not be reinvested in JELD-WEN stock unless a Class Member affirmatively elected to direct his or her investment. In short, the final settlement agreement was the result of more than a year and a half of negotiations. The parties finally executed a Class Action Settlement Agreement on January 30, 2015.

31. In addition, Co-Lead Counsel obtained valuable equitable relief in the form of a prohibition on any further assessment of new expenses that has been effectively in place since 2013. Although the exact value of the prohibition on new expenses is unknown, based on the fact that these fees exceeded $11 million between 2010 and 2012, we conservatively estimate the value of the prohibition to be worth millions to participants in the Plan.

32. Additionally, the non-monetary relief includes attorney review of the annual valuations until the Terminated Class is completely distributed in 2021 and a prohibition on reinvesting the settlement proceeds in JELD-WEN stock unless the participant affirmatively elects.

33. My firm regularly, nearly exclusively, represents classes of plaintiffs in federal litigation. In class-action cases, we operate exclusively on a contingent fee basis.

34.     From the outset of this case, I have viewed this litigation as risky. Class actions are normally risky cases because, due to the amounts involved, defendants mount a vigorous defense. Certification can easily shrink or eliminate the class which renders these cases economically unviable. ERISA class cases, especially ESOP litigation, are especially risky. The statute is complicated, the law (often coming from the Supreme Court) changes frequently, there are special issues with certification, and there is always a risk of default since the only asset of the plan is company stock. This is simply a brief overview of the risks and it does not, nor is it intended to, capture all of the risks facing class action ESOP ERISA litigation.

35.     All of my firm's efforts were conducted efficiently and with cost-savings in mind. Being on a contingent fee basis, Plaintiffs' Counsel had every incentive to undertake this massive project with an eye to flattening the learning curve and avoiding "make work" projects. Any inefficiencies would take time away from other potential revenue-generating projects.

36.     Furthermore, my firm coordinated with Cohen Milstein and Izard Noble at all times to ensure our firms operated efficiently and did not over bill the clients in this case for our work. Any time two or more attorneys worked on a task, it was because we concluded the task was worthy of such attention, could benefit from more than one perspective, or was labor intensive enough to justify such attention.

37.     Along with co-counsel, we have spent over three years investigating the claims against Defendants, reviewing and analyzing Plan documents and information, preparing the Complaint and amendments thereto, conducting necessary legal research, briefing and arguing Defendants' motion to remand and Plaintiffs' motion to compel, briefing the appeal of the rulings on these motions, review of thousands of pages of documents, preparing and reviewing the full merits briefs on the issues, multiple mediation sessions, protracted

Exhibit 1

negotiations, conducting confirmatory discovery, preparing for and taking oral discovery, renegotiating the settlement to provide for an addition $1.5 million in recovery, and preparing the necessary agreements and pleadings related to the settlement.

38. We have not received any compensation for our services to date.

39. From my firm's contemporaneous time records, my firm expended the following hours for each timekeeper:

| Timekeeper | Position | Rate | Hours | Lodestar |
|---|---|---|---|---|
| Matthew Hurst | Partner | $600 | 858.5 | $515,100 |
| Matthew Heffner | Partner | $600 | 553.25 | $331,950 |
| Glenn Hara | Associate | $425 | 26.5 | $11,262.50 |
| S. Pavlat | Paralegal | $200 | 10 | $2,000 |
| T. Murtaugh | Paralegal | $200 | 20.25 | $4,100 |

40. Our total lodestar to date is $864,412.50.

41. The rates of each timekeeper are those that are customary for an ERISA attorney of that experience. Since ERISA is practiced nationally, the rates reflect the national rates for this type of work.

42. I was primarily responsible for drafting Plaintiffs' Counsel's fee brief. None of the time spent on the fee brief has been included in the lodestar.

43. Stoll Berne, who served as Heffner Hurst's local counsel until the matter was transferred to Medford, has provided us with its contemporaneous time records and expenses. The records show that the firm spent 39.25 hours on the litigation for a total lodestar of $14,610.75.

44. My firm's and Stoll Berne's total lodestar to date is $879,023.25.

Exhibit 1

45. We expect to expend additional time of 65 hours to complete this litigation. This includes work on the final approval brief, inquiries from class member, administration of the settlement, implementation of the Plan of Allocation, and review of valuations through 2021. The total estimated lodestar for this work is $39,000.

46. The total lodestar of my firm, through the end of settlement, is $918,023.25.

47. When I took this case, based on the state of the law, risk, and estimated duration, I expected an attorney's fee award of between 30- 33% of any recovery. I also understood there was a high likelihood my firm might recover nothing in this case given its risky nature.

48. In any class action case, we expect to recover expenses from the recovery just as we would from any paying client.

49. My firm's expenses, necessary to the successful prosecution of this case, are $29,811.90 and are as follows:

   a. Mediator fees: $10,047.09
   b. Travel: $10,248.74
   c. Research charges: $7,273.62
   d. Postage: $584.68
   e. Filing fees: $550.00
   f. Other related and necessary expenses: $1,107.77

I declare under penalty of perjury that the foregoing is true and correct.

_____
Matthew Hurst

7/20/15
Date